United States District Court
District of New Jersey

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| v. | : | |
| RICHARD KAPLAN | : | Magistrate No. 08-3547 |

I, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief:

SEE ATTACHMENT A

I further state that I am a Special Agent of the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT B

EDWARD QUINN, SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me and subscribed in my presence,
March 31st 2008, at Newark, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

ATTACHMENT A

From in or about November 2007 to on or about March 30, 2008, in Cumberland and Middlesex Counties, in the District of New Jersey and elsewhere, defendant

RICHARD KAPLAN

knowingly and willfully used and caused another to use the mail and facilities in interstate commerce, with the intent that a murder be committed in New Jersey in violation of the laws of New Jersey, as consideration for the receipt of, and as consideration for a promise and agreement to pay, a thing of pecuniary value.

In violation of Title 18, United States Code, Section 1958(a) and Section 2.

ATTACHMENT B

I, Edward Quinn, a Special Agent of the Federal Bureau of Investigation ("FBI"), having conducted an investigation, having spoken with other law enforcement agents, and having reviewed reports, other documents, and recordings, am aware of the facts detailed below. Because the attachment is submitted for the limited purpose of establishing probable cause, I have not included herein details of every aspect of the investigation. Statements attributed to individuals herein are related in substance and in part.

1. On or about April 20, 2007, defendant Richard Kaplan ("Kaplan"), a rehabilitation construction inspector and assistant zoning officer for the City of New Brunswick, pled guilty to a one-count Information before the Hon. Joseph E. Irenas, U.S.D.J. The information charged Kaplan with accepting corrupt cash payments and other benefits totaling more than $30,000, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2. On or about September 6, 2007, Kaplan was sentenced to 30 months' imprisonment and a $30,000 fine. Kaplan reported to FCI Fairton [hereinafter "the Jail"] on or about October 2007 and is due to be released in or about December 2009.

2. The intended victim is Kaplan's wife [hereinafter "M.K."] who lives in New Brunswick, New Jersey. Evidence obtained through this investigation reveals that Kaplan wants to have M.K. killed for monetary and other reasons.

3. A cooperating witness [hereinafter "CW"], is an inmate at the Jail who became acquainted with Kaplan.

4. At all times relevant to this Complaint, a law enforcement officer acting in an undercover capacity ("UC") held himself out as a "hit-man," who was willing to commit murder in exchange for payment.

5. On or about February 8, 2008, I, and other law enforcement authorities, interviewed the CW at the Jail. CW stated the following:

(A) According to conversations with Kaplan, Kaplan initially appeared to have a good relationship with his wife, but the relationship became strained by the end of November or beginning of December 2007.

(B) At that time, Kaplan regularly began asking the CW whether the CW knew of anyone who could kill his wife. Kaplan had that conversation with the CW as recently as the day before I interviewed the CW.

(C) Kaplan told the CW that he (Kaplan) was willing to pay someone $25,000 to $30,000 to kill his wife.

(D) Kaplan advised that if the CW was able to come up with someone who was willing to commit the murder, Kaplan would like to meet with that person during visiting hours at the Jail.

6. After meeting with the CW and learning the above information, law enforcement authorities directed the CW to advise Kaplan that, if he wanted to go through with the plot, a "hit-man" would be made available to meet with Kaplan at the Jail after the "hit-man" had received some "good faith" money from Kaplan. In that regard, law enforcement authorities directed the CW to advise Kaplan that, if Kaplan wished to have his wife killed, Kaplan should have someone wearing a baseball cap and carrying a magazine deliver the money to the "hit-man" on March 20, 2008, at a restaurant on Easton Avenue in New Brunswick, New Jersey.

7. On or about March 5, 2008, Kaplan and the CW had a consensually recorded conversation at the Jail. During Kaplan's conversation with the CW, in substance and in part, Kaplan stated the following:

(A) that Kaplan really wanted to have his wife killed because of money, because of Kaplan's belief that she was "conspiring" with her family against Kaplan, and because of his wife's creating distance from, and treatment of, Kaplan since he's been in prison.

(B) that Kaplan wanted his wife to be killed in what would look like a "car accident," where the car also was completely destroyed so that the police would take the car away, and, as Kaplan said, " . . .. that's the end of that . . . so I'm killing two birds with one stone here more or less."

(C) that Kaplan would try to get money to give to the "hit-man" up-front by contacting his accountant or his family and then after the his wife's death, he could get the rest from the estate.

(D) that Kaplan would have his daughter, or another individual, deliver about two thousand dollars on March 20th, as a good faith payment to the "hit-man" to kill his wife. The person delivering the money would be wearing a baseball cap and would carry a magazine.

(E) that Kaplan knew exactly what he wanted to do and that he wanted to have his wife killed.

8. I then had additional conversations with the CW after the CW spoke with Kaplan on March 5, 2007. The CW informed me that Kaplan was contacting his accountant to ask for money (which would be used to make a good faith up-front payment to the "hit-man"). At law enforcement's direction, the CW informed me that he told Kaplan that if Kaplan wanted to go forward with the murder of his wife, Kaplan needed to mail a letter to a post office box at a certain specified location in New Jersey (an undercover post office mail box). The letter should state that Kaplan wanted to proceed with what they had previously discussed and reiterate the time and place (*i.e.*, New Brunsick restaurant on March 20, 2008) for the good faith money drop. The CW told me that Kaplan conjured up the name of "Robert Grooms" for the "hit-man"/addressee of the letter.

9. On or about Thursday, March 13, 2008, Kaplan submitted two envelopes to the prison authorities for the purpose of placing in the U.S. mail for delivery. Both of the envelopes had handwriting in blue ink with the sender written as "Richard Kaplan - 28621-050; FCI Fairton; Satellite Camp; P.O. Box 420; Fairton, N.J. 08320." Number 28621-050 is Richard Kaplan's inmate number at the Jail. One letter was addressed to "Robert Grooms" at the P.O. Box location in New Jersey. The other letter was addressed to an individual[1] at an address in Highland Park, N.J.

10. On or about March 18, 2008, after obtaining a warrant from U.S. Magistrate Judge Michael A. Shipp, I searched the contents of the envelopes. In the envelope addressed to "Robert Grooms," who Kaplan believed to be the "hit-man," Kaplan wrote in substance and in part,

> My friend [the Accountant] will be coming to [New Brunswick restaurant] at 1:00 P.M. on the 20th of March. He will be driving a silver BMW. He will meet you as planned in front of Boston Market. He will be wearing a baseball cap with a white shirt and Tie [sic]. He will have envelope with cash in it (2000 for deposit). Everything is a *go* [emphasis in the original]. Thank you. I will have your friend call you if there is a change.

---

[1] The investigation has revealed that the individual is an associate of and accountant for defendant Richard Kaplan (hereinafter "the Accountant").

11. I also searched the contents of the envelope addressed to "[the Accountant]." In that letter, Kaplan asked the Accountant to "cash his check as soon as he receive(s) it," "[t]ake the cash to Boston Market on Easton Ave.," and told the Accountant to "[g]o there at 1:00 P.M. in the afternoon on the 20th of March." In the letter, Kaplan further instructed the Accountant to "[p]lease wear baseball cap and your white shirt and tie," and to, "[p]lease have my envelope with you (2000 cash)."

12. Finally, in the letter, Kaplan told the Accountant that the individual who the Accountant would be meeting was a private investigator. Kaplan explained to the Accountant, in substance and in part, "I hired him to check up on [my wife] in case I need something on her for my divorce. She is doing thing [sic] behind my back with her son and some other family members." Kaplan signed the above letter, "[t]hank you. I will call you. Richard." At the conclusion of the letter, Kaplan wrote, "P.S. Destroy this letter."

13. Law enforcement authorities thereafter placed these letters in the U.S. mail for delivery, as Kaplan initially had directed.

14. Kaplan also had numerous, consensually monitored telephone calls with the Accountant from the Jail where he discussed his troubles with M.K. During these calls, Kaplan arranged to give the Accountant power of attorney. They also arrange for the Accountant to get a $2,000 check from Kaplan's IRA account, for the Accountant to cash the check, and for the Accountant to then do what Kaplan would ask him to do in a letter that he had sent to the Accountant I further learned from the Bureau of Prison officials that Kaplan had sent a package from the Jail to the Accountant.

15. On or about March 20th, the Accountant met "Robert Grooms," the UC posing as the "hit-man" and, as per Kaplan's instructions, gave "Grooms" the $2,000 cash from Kaplan to serve as a "deposit."

16. On or about March 30th, at approximately 11:45 a.m., Kaplan met with the UC at the Jail. During the consensually video and audio recorded meeting, Kaplan stated the following in sum and substance:

(A) that Kaplan wanted his wife killed Wednesday or Thursday of this week (i.e., April 2nd or 3rd);
(B) that Kaplan wanted his wife killed in a staged car accident;
(C) that Kaplan would pay the "hit-man" the remaining balance of the fee for killing his wife when he got out of the Jail on furlough for his wife's funeral. He told the UC that he had $5000 in a safe to pay for the murder;

(D) that Kaplan wanted his wife killed not just hurt, because if she was only hurt, she could still divorce him;

(E) that if Kaplan were not in prison, he would break his wife's neck himself;

(F) that Kaplan was sure that he wanted his wife killed and had no remorse; and

(G) that Kaplan understood that once the "hit-man" departed the jail, it was a done deal.